UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

LAUREN D'ANNUNZIO, ASHLEY D'ANNUNZIO,       :
and GABRIELLE D'ANNUNZIO,                     :
                                              :
                    Plaintiffs,               :
                                              :       <u>ORDER</u>
           -against-                          :       11-CV-3303 (WFK) (WDW)
                                              :
AYKEN, INC. d/b/a/ AYHAN'S FISH KEBAB         :
RESTAURANT, AYHAN HASSAN, and DARIO           :
GOMEZ,                                        :
                                              :
                    Defendants.               :

-------------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge**

In July 2008, seventeen-year-old Lauren D'Annunzio was violently and sexually assaulted by co-worker Juan Pablo Orellano in the basement of Ayhan's Fish Kebab Restaurant. Orellano was subsequently charged and deported for the assault. Lauren D'Annunzio, along with sisters and co-Plaintiffs Ashley and Gabrielle D'Annunzio, now bring forth overwhelming evidence of further harassment they encountered while working at Ayhan's Fish Kebab Restaurant. The evidence demonstrates that Orellano and other employees made unwanted sexual comments and vulgar sexual motions toward the Plaintiffs; slapped Plaintiffs' buttocks; exposed Plaintiffs' bras; and touched their breasts. While this pervasive abuse was occurring, Ayhan's Fish Kebab Restaurant took no meaningful corrective action.

The question before the Court today is whether Ayhan's Fish Kebab Restaurant (alternately known as "Ayken") should be held liable for the appalling sexual abuse that Plaintiffs were forced to endure. The Court answers that question with one word: Yes.

<u>**FACTUAL BACKGROUND**</u>

**I.      Defendants' Hiring Practices**

Plaintiffs are former employees of Ayhan's Fish Kebab Restaurant in Port Washington,

New York. Dkt. 25 (Pls.' 56.1 St.) at ¶ 1.[1] Plaintiffs Gabrielle, Lauren, and Ashley D'Annunzio

started working at Ayhan's as hostesses in June 2005, March 2006, and August 2007,

---

[1] The Court incorporates by reference the sources cited in the Undisputed Facts.

respectively. *Id.* at ¶¶ 2-4. Defendant Ayhan Hassan is the President and sole shareholder of Ayken, also known as Ayhan's. *Id.* at ¶ 6. Defendant Dario Gomez is and has been the General Manager of the restaurant for about ten years and reports directly to Hassan. *Id.* at ¶¶ 7–8.

Gomez's duties include supervising, disciplining, training, hiring, and firing all Restaurant employees, although Gomez lacks the authority to hire chefs or assistant managers. *Id.* at ¶¶ 9–10. The restaurant's staff includes kitchen workers, servers, busboys, and hostesses. *Id.* at ¶ 24. During the period in question, Ayken did not require Gomez to conduct formal performance reviews of the restaurant's employees. *Id.* at ¶ 11. As the manager, Gomez was and is responsible for addressing all employee complaints and stopping any inappropriate behavior by employees. *Id.* at ¶¶ 12–13. Gomez was also required to report any inappropriate behavior to Hassan. *Id.* at ¶ 14.

Ayken utilizes an Employee Handbook, which contains policies on harassment, personal misconduct, and personal relationships. *Id.* at ¶ 15. Hassan developed the policies set forth in the Employee Handbook and reviews and evaluates them every couple of years. *Id.* at ¶ 16. Gomez was and is responsible for training all staff on the Employee Handbook's policies. *Id.* at ¶ 17. Ayken distributed copies of a prior Employee Handbook from 1999 to 2002; though Ayken stopped distributing copies of the 1999 Handbook in 2002, it was still in use after 2002. *Id.* at ¶¶ 18–20. Ayken did not display any posters about sexual harassment policies until after July 2008, when Plaintiffs' employment at the restaurant ceased. *Id.* at ¶ 23.

Ayken employs approximately twenty employees at the restaurant, with about half being kitchen staff, such as dishwashers, cooks, busboys, and the chef. *Id.* at ¶ 25. The kitchen staff and busboy positions are primarily held by men, whereas the server and hostess positions are largely held by women. *Id.* at ¶ 26. The primary language of communication for the kitchen

workers is Spanish. *Id.* at ¶ 27. Gomez speaks fluent Spanish. *Id.* at ¶ 28. Though Gomez provided newly hired employees with the Employee Handbook, no Spanish translation of the handbook was available. *Id.* at ¶¶ 29–30. During the relevant period, neither Hassan nor Gomez knew whether the employees whose primary language was Spanish understood the contents of the Employee Handbook. *Id.* at ¶¶ 32–33. On those occasions where employees had questions about the Employee Handbook, they usually asked about the company's vacation policy. *Id.* at ¶ 34. Gomez cannot recall whether he spoke to new hires about the Employee Handbook or the harassment policy during the employees' training period. *Id.* at ¶ 35.

The Employee Handbook's sections on "Personal Misconduct," "Personal Relationships," and "Harassment" prohibit the following types of behavior: interfering with the work performance of another employee; "immoral behavior, gross misconduct, harassment or use of abusive or vulgar language while on company premises or while engaging in company related business"; derogatory language or slurs; comments about an individual's body; use of sexually degrading words; physical harassment such as touching or assault; and requests for sexual favors or unwanted sexual advances. *Id.* at ¶¶ 36–37. Company policy also required employees to refrain from dating each other. *Id.* at ¶ 37. Pursuant to the Employee Handbook and corporate policy, Gomez was and is required to report "acts of possible sexual harassment" to Ayken's Human Resource Manager, Jacqueline Mulligan, "before it become[s] severe or pervasive." *Id.* at ¶¶ 39–40. According to the Employee Handbook, management "will immediately investigate the complaint and undertake immediate and appropriate corrective action whenever it determines that harassment has occurred." *Id.* at ¶ 50. During his tenure as General Manager at the restaurant, Gomez has never reported any instances of possible sexual harassment to either Mulligan or Hassan. *Id.* at ¶¶ 41–42, 46.

3

Hassan visits the restaurant every day and speaks with Gomez over the phone at least twice a day. *Id.* at ¶¶ 43–44. However, Gomez never saw Hassan speak with any workers about the company's harassment or misconduct policies. *Id.* at ¶ 45. During the relevant period, Gomez consulted with Hassan only when hiring servers, but in hiring for other positions, Gomez merely notified Hassan. *Id.* at ¶ 51. While Gomez routinely followed up with references for applicants seeking a position as a server, Gomez only called a potential kitchen staff or busboy's former employers or references on one or two occasions during the past ten years. *Id.* at ¶¶ 52–53. Defendants never conducted background checks, including any examination of past criminal activity, on any newly hired kitchen staff or busboys. *Id.* at ¶¶ 54–55.

Gomez was the General Manager when he interviewed and hired Juan Pablo Orellano ("Orellano") as a dishwasher at the restaurant. *Id.* at ¶¶ 56–57. Gomez did not call any of Orellano's former employers or references nor did he conduct a background check prior to hiring Orellano. *Id.* at ¶¶ 60–61. Gomez cannot recall whether he spoke to Orellano regarding Ayken's harassment, misconduct, or personal relationship policies, whether he spoke to Orellano regarding the Employee Handbook, or whether the Employee Handbook was in effect when he hired Orellano. *Id.* at ¶¶ 62–64.

## II. Plaintiffs' Allegations of Sexual Harassment

### A. Gabrielle D'Annunzio

Plaintiffs allege that Orellano and Gabrielle worked next to each other in the restaurant, working at least two days a week together for three to four hours at a time. *Id.* at ¶¶ 73–74. During Gabrielle's employment at the restaurant from June 2005 to July 2008, Orellano slapped Gabrielle's and co-Plaintiff Lauren's buttocks between five and ten times. *Id.* at ¶ 70. Orellano told Gabrielle on six or seven occasions that her legs were "big" and "muscular" and that she has

a "really big butt and that he likes women like that." *Id.* at ¶ 71. Orellano offered massages to Gabrielle. *Id.* at ¶ 72. On other occasions, Orellano worked in tandem with another employee, Carlos Marquina, to make lewd gestures towards Gabrielle. For example, after Orellano tapped Gabrielle's shoulder to get her attention, Marquina made motions of a "hand job" towards Gabrielle. *Id.* at ¶ 78. During another incident, after Orellano tapped Gabrielle's shoulder, Marquina made a "humping" motion and directed other sexual movement toward Gabrielle. *Id.* at ¶ 79.

Victor Bautista was and is a delivery man for Ayken. Decl. of Victor Bautista at ¶ 1. Bautista would "always ask out [Gabrielle] out on the phone and ask [her] what [she] was doing after [her] shift, which was very uncomfortable [for Gabrielle]." Pls. 56.1 St. at ¶ 81. Plaintiffs further claim that on about four occasions, when Bautista would come to the restaurant to pick up food, he would intentionally touch Gabrielle's hand by putting his hand on top of hers. *Id.* at ¶ 82.

Jamie Coronel, another employee at the restaurant, allegedly worked with Gabrielle at least two days a week for three to five hours at a time. *Id.* at ¶ 77. Coronel purportedly told Gabrielle in May or June 2008 that he wanted to "pleasure [her] and he wanted to treat [her] right and that he could please [her] in bed." Pls. 56.1 St. at ¶ 75. Coronel also asked Gabrielle to go out on multiple occasions. *Id.* at ¶ 76. Furthermore, in March 2008, Coronel allegedly told Gabrielle that he could pleasure her and described what he could do to her in bed. *Id.* at ¶ 85.

### B. Lauren D'Annunzio

Like Gabrielle, Lauren was subject to sexually charged comments during her employment at Ayken. *Id.* at ¶¶ 86-87. Lauren worked two days a week, three to four hours at a time with Coronel. *Id.* at ¶ 89. Within six months of the start of Lauren's employment, Coronel

made weekly comments to Lauren that she was "so beautiful and what [he] would do if [he] had [her]" and how he could "pleasure" Lauren and her sister Gabrielle. *Id.* at ¶¶ 87-88.

Lauren also was subject to sexually harassing touching and comments by Orellano each time they worked together, which was about three to four days per week, and for three to four hours each session. *Id.* at ¶¶ 90, 95. These included a hug, an arm around Lauren's waist, grabbing of Lauren's sides, touching of her buttocks, and touching the side of her breast. *Id.* at ¶ 91. Orellano also massaged Lauren and on a few occasions, pushed up Lauren's shirt to expose her bra. *Id.* at ¶ 92. These incidents, which became progressively worse, were witnessed by other kitchen staff. *Id.* at ¶ 93-94. Orellano also purportedly made comments including: "I want to have sex with you here," "I want to take my penis and put it in your vagina," and statements regarding Lauren's breasts and how she should leave her boyfriend because Orellano could pleasure her more than him. *Id.* at ¶¶ 96-99. These comments were allegedly witnessed by the kitchen staff, including Dario Gomez, who would "laugh along together and ... find[] it comical." *Id.* at ¶ 100.

In July 2008, Plaintiffs allege that Orellano came up behind Lauren in the basement of the restaurant, held her in a bear hug, and started "squeezing [her] really tight." *Id.* at ¶ 102. He continued to do so, despite Lauren's efforts to maneuver her way out, and started "groping [her] breasts and [] pushing his fingers between [her] legs." *Id.* at ¶ 103. Lauren began "shouting for help and screaming for [Orellano] to get off of [her]," while Orellano was "kissing [her] neck and whispering in [her] ear how much he wanted [her] and ... [that] he wanted to do sexual things to [her.]" *Id.* at ¶ 104. Eventually a busboy, Mario, came down the stairs, and Orellano "threw [her]" off." *Id.* Orellano was subsequently arrested and charged with Attempted Sexual Abuse in the First Degree. *Id.* at ¶ 69. He pleaded guilty and was subsequently deported. *Id.*

### C. Ashley D'Annunzio

Within her first month of working at the restaurant, Ashley D'Annunzio was allegedly subject to sexual comments from Orellano, whom she worked with one to two days a week together for three to five hours at a time. *Id.* at ¶¶ 105, 108. These included telling her she was "sexy" and had a "nice figure." *Id.* at ¶ 105. Orellano also allegedly tried to massage Ashley's shoulders. *Id.* at ¶ 107. Ashley was also subject to comments from an employee named "Carlos" that she was "beautiful, sexy, [and had a] very nice figure." *Id.* at ¶ 109.

Ashley was subject to similar comments from Coronel, who would remark daily on "how beautiful [she] was, how sexy," and Ashley's figure. *Id.* at ¶ 111. Coronel asked to see Ashley outside of work "approximately once a week," told her he could "pleasure" her, and said he could "take care" of her when he learned that Ashley did not have a boyfriend. *Id.* at ¶ 112–114. Ashley was also subject to another bus boy gesturing to the other kitchen staff that she had a "nice chest." *Id.* at ¶ 116.

### D. Plaintiffs' Complaints Regarding Alleged Harassment

Plaintiffs allege that they each made complaints about the harassment they encountered. *Id.* at ¶ 117. In June 2006, after Orellano first "slapped her in the butt," Gabrielle complained to Gomez that the employees were "actually touching [her] and disrupting [her] performance," and stated that because she and Orellano were working side-by-side, "it needed to be brought to [his] attention." *Id.* at ¶¶ 118–120. Gomez stated that he would take care of it, but Orellano continued "slapping Gabrielle's butt." *Id.* at ¶¶ 121–122. Gabrielle complained again to Gomez, but Orellano did not stop his actions. *Id.* at ¶¶ 124–125. Despite Gabrielle complaining for the third time, Gomez did not discipline Orellano or report the conduct to the company Human Relations Manager. *Id.* at ¶¶ 125–126. Gabrielle also complained to Gomez about Bautista, the

delivery worker, and Coronel. Gomez did not notify the corporate office or Hassan about Gabrielle's alleged harassment. *Id.* at ¶¶ 127-138.

Lauren also complained to Gomez three times about Orellano's "sexually harassing touching," but Gomez did not discipline Orellano or report the conduct to the company. *Id.* at ¶¶ 140–153. Instead, "Lauren observed Gomez joking along with sexually harassing comments that other kitchen staff made about her." *Id.* at ¶ 156. Similarly, Ashley D'Annunzio "complained to Gomez about the sexually harassing comments that Orellano and others made toward her when she went with Gabrielle to complain to Gomez together." *Id.* at ¶ 163. In response, Gomez stated that Orellano was "harmless" and "[didn't] mean anything by it." *Id.* at ¶ 164.

### III. Defendants' Evidence

#### A. Declaration of Dario Gomez

Dario Gomez submits an affidavit in opposition to Plaintiff's Motion for Summary Judgment. *See* Dkt. 34. In it, Gomez alleges that he works in the "open kitchen area, which includes the hostess/cashier stand, overseeing the food preparation, hostesses/cashiers, bus boys and dishwashers." *Id.* at ¶ 4. Gomez states that he is "constantly interacting with hostesses and kitchen staff," and that "since the alleged comments and conduct were so frequent, it is not feasible that I would not have heard at least one of these alleged comments or observed at least one of these alleged incidents of physical contact." *Id.* at ¶ 6; *see* ¶ 8–10. Gomez also denies that he ever laughed along with any sexually harassing comments and denies that he ever received complaints from Plaintiffs about them, with the exception of Gabrielle's complaint about Bautista. *Id.* at ¶¶ 8, 11, 18, 19. Gomez states that when Gabrielle told him about Bautista, Gomez spoke to Bautista and told him not to come into the restaurant anymore. *Id.* at ¶ 19.

### B. Declaration of Ayhan Hassan

Defendants also submit a declaration from Defendant Hassan, the President of the corporate Defendant Ayken, Inc. Dkt. 33. Hassan states that "the Plaintiffs were never [his] employees" because they were "employees of the Defendant, Ayken, Inc., d/b/a/ Ayhan's Fish Kebab Restaurant." *Id.* at ¶ 2. Hassan also states that "Jamie Coronel, Victor Vasques and Juan Orellano are no longer employees of Ayken, Inc. and their current place or residence or employment is unknown. Upon information and belief, they do not currently reside in this country." *Id.* at ¶ 3.

### C. Declaration of Victor Bautista

Victor Bautista denies Plaintiffs' claims of harassment. In response to Gabrielle D'Annunzio's allegations that he asked her out, asked her what she was doing after her shift, and touched her hand, Bautista declares that he "did not do that." Dkt. 35 at ¶ 2. He also explains that after Dario Gomez asked him "what [Bautista] said or did to Gabrielle D'Annunzio that made her uncomfortable," Bautista told Gomez that he "did not do anything to make her uncomfortable," but that Gomez "instructed [Bautista] not to go into the restaurant[.]" *Id.* at ¶ 3.

### D. Declaration of Carlos Marquina

Carlos Marquina, an assistant chef and chef at Ayhan's, contradicts Plaintiffs claims. Dkt. 36 at ¶ 1. Marquina denies Ashley D'Annunzio's allegations that he stated Ashley was "beautiful, sexy," and had a "very nice figure" two out of every four days, and states that he "never made such comments or any other sexually inappropriate comments" to her. *Id.* at ¶ 2. "In fact, [he] rarely spoke to Ashley D'Annunzio." *Id.* at ¶ 2. Marquina also denies making either a "hand job" or "humping" motion. *Id.* at ¶ 3.

## APPLICABLE LAW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this Court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal citations and quotation marks omitted). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

If the moving party satisfies this burden, the non-moving party must "make a showing sufficient to establish the existence of [each] element to that party's case. . . . since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *accord Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) ("Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."). Importantly, if the evidence produced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted). The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials,

but must bring forward "some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997).

## DISCUSSION

### I.  Title VII

Plaintiffs set forth overwhelming evidence that Defendant Ayken created a hostile work environment in violation of 42 U.S.C. § 2000, *et seq.* ("Title VII"). It is manifestly apparent that Plaintiffs were subject to severe harassment, culminating in one of the Plaintiffs being attacked by a fellow co-worker. Because no rational trier of fact could find for Defendant on the Title VII claim, the Court grants summary judgment to Plaintiffs.

"Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Generally, to establish a hostile work environment claim under Title VII, a plaintiff must produce "enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2012) (internal citations omitted). Actionable sexual harassment under Title VII may include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. *Meritor Sav. Bank*, 477 U.S. at 65.

11

To determine whether a hostile work environment exists, a court will examine the "totality of the circumstances," which encompasses the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating as opposed to a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010); *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal citation and quotations omitted). "[E]ven a single episode of harassment can establish a hostile work environment if the incident is sufficiently severe." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012).

Further, to succeed on a Title VII hostile work environment claim against an employer, the plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004). An employer is liable for a hostile work environment in the workplace when the employer knew, or should have known, of the hostile work environment but failed to take appropriate remedial action. *See Duch v. Jakubek*, 588 F.3d 757, 763 (2d Cir. 2009); *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (an employer is liable if it failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action). The sufficiency of an employer's remedial actions is evaluated under the totality of the circumstances. *Duch*, 588 F.3d at 766.

Plaintiffs submit that the harassment is sufficiently documented to justify summary judgment, while Defendants argue that the harassment was not pervasive enough to withstand it. *See* Dkts. 24, 37, 43, 46. Although the Defendants attempt to create a factual dispute as to the extent of harassment and Ayken's liability for it, the record defeats them. While cases such as *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) correctly state that hostile work environment claims are "especially well-suited for jury determination," in this case the outrageous actions of the Defendant and its employees were simply too gross to ignore.

The Defendants move for summary judgment by arguing that Plaintiffs failed to create a genuine issue of material fact as to whether the alleged conduct was severe or pervasive. This argument is indefensible. The record is replete with specific facts alleging that Plaintiffs endured prevalent abuse and harassment at the workplace, and that the acts were subjectively and objectively severe or pervasive enough to alter the terms of Plaintiffs' employment. *See Cruz v. Coach Stores*, 202 F.3d 560, 570 (2d Cir. 2000) ("Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.") (superseded by statute on other grounds, Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85). Gabrielle D'Annunzio experienced approximately thirty instances of sexual harassment, including having her buttocks grabbed. Lauren D'Annunzio was sexually harassed three to four days a week, including physical harassment such as Orellano's exposing of her bra and grabbing of her body. In addition, it is undisputed that Orellano physically attacked her in the basement of the restaurant in July 2008. Finally, Ashley D'Annunzio was subjected to on-going comments about her figure and how she could be sexually pleasured outside of work.

13

These facts demonstrate that the conduct was severe and pervasive, and that an objectively hostile work environment was created. Defendants' absurd attempts to argue that the grabbing and slapping of Plaintiffs' butts, touching of breasts, and pulling up of Plaintiff Lauren's blouse constitute non-actionable "innocuous physical contact" are an outrageous misstatement of the record. *See* Dkt. 43 at 23, 30; *Redd*, 678 F.3d at 178–80 (reversing summary judgment in favor of defendant because three occasions of breast touching was "severely intrusive and [could not] properly be characterized as abuse that [was] 'minor'"); *Raniola v. Bratton*, 243 F.3d 610, 621 (2d Cir. 2001) (triable issue of material fact where over two and a half years, plaintiff was subject to offensive sex-based remarks, workplace sabotage, and one serious public threat of physical harm). Plaintiff Ashley D'Annunzio was subject to other employees making gestures about her chest, looking her up and down, commenting on how beautiful and sexy she was, and asking her out on a date. *See Hollis v. City of Buffalo*, 28 F. Supp. 2d 812, 820-21 (W.D.N.Y. 1998) (Heckman, M.J.) (comments on plaintiff's breasts, repeated use of vulgar and offensive language, and leaving inappropriate messages left "no doubt that plaintiff's workplace was permeated with discriminatory intimidation, ridicule, and insult") (citations omitted); *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 377 (S.D.N.Y. 2006) (Sweet, J.) (plaintiff who was subject to highly sexual remarks stated claim for hostile work environment); *see also Grant v. Coken*, 01-CV-6400, 2004 WL 2066886, at *3-4 (N.D. Ill. Sept. 14, 2004) (granting plaintiff's unopposed summary judgment motion because harasser's conduct was a "daily barrage of uninvited sexual solicitations, unwanted touching, and threatening and intimidating words and actions"). Further, the single incident of sexual abuse as to Lauren D'Annunzio alone supports a claim of hostile work environment. *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (reversing grant of summary judgment in

14

favor of defendants and holding that: "We have no doubt a single incident of rape can satisfy the first prong of employer liability under a hostile work environment theory"); *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (noting a single sexual assault may be sufficient to alter the terms and conditions of the victim's employment).

Plaintiffs also complained to Gomez on multiple occasions about the harassment they experienced. These allegations are well-supported in the record, which documents that by the totality of the circumstances, the harassment was subjectively severe or pervasive. *Joseph v. HDMJ Rest., Inc.*, 970 F. Supp. 2d 131, 145 (E.D.N.Y. 2013) (Seybert, J.) (plaintiff "subjectively perceived her work environment to be hostile, as evidenced by her complaints about the unlawful behavior. ...[f]urther, by complaining about her treatment in the workplace, Plaintiff made it sufficiently clear that her employers' lewd behavior was negatively affecting her work environment.").[2] Defendants' motion for summary judgment on these grounds is therefore ludicrous and is denied.

Moreover, the detailed and overwhelming evidence of disturbing sexual harassment in this case compel summary judgment in favor of Plaintiffs. Plaintiffs have submitted detailed declarations attesting to the harassment they endured by Orellano, Marquina, Bautista, and Coronel during their employment. Plaintiffs Gabrielle and Lauren D'Annunzio also state that Gomez laughed along with the harassment. Although Defendants have submitted affidavits

---

[2] Defendants' arguments that Plaintiffs continued to work at the restaurant are not dispositive. Defendants cite *Morris v. City of Colorado Springs*, 666 F.3d 654, 669 (10th Cir. 2012), but there, the court did "not definitively opine" on the matter. Instead, it found that several factors, of which the plaintiff's decision to work with the alleged harasser was one, "suggest[ed]" that she did not view the incident as severe. *Id.* In its ruling, the court specifically distinguished the facts before it from "instances of sexual assault—conduct that clearly could be objectively viewed as threatening and severe." *Id.* at 667. In *Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 806–07 (11th Cir. 2012), another out-of-circuit case cited by Defendants, the plaintiff asked the alleged harasser to help her return to work and admitted to hugging, kissing, and joking with him.

from Gomez, Bautista, and Marquina contesting these claims and stating that they did not participate in any of the alleged harassment, those conclusory protestations are clearly insufficient to withstand summary judgment. *Compare* Dkts. 27–29 *with* Dkts. 34-36; *see Liberty Lobby, Inc.*, 477 U.S. at 247-48 ("The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."); *Franklin Cap. Holdings LLC v. NY Accessory Grp., LLC*, 13-CV-1153, 2014 WL 2117265, at *4 (S.D.N.Y. May 21, 2014) (Baer, J.) ("Defendant attempts to rely on conclusory allegations or unsubstantiated speculation or on mere denials or unsupported alternative explanations of its conduct, which is insufficient to defeat summary judgment.") (citations omitted). Gomez's declaration and deposition do little to bolster his claim that that if such pervasive harassment had occurred, he would have heard it. *Compare* Dkt. 34 *with* 26 at Ex. E, 142–44; *see Delaware & Hudson Ry. Co v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue."). The record clearly supports the Plaintiffs' claim that Ayken did nothing about the toxic work environment of which it knew, or had constructive knowledge.

While the Court recognizes that summary judgment in favor of plaintiffs is not ordinarily granted, the outlandish behavior of Defendants in this case compels it. Here, Ayken was complicit in every way: it provided no reasonable avenue for complaint, and although clearly aware or constructively aware of the harassment, did nothing about it. *See Notaro v. Fossil Indus., Inc.*, 820 F. Supp. 2d 452, 459 (E.D.N.Y. 2011) (Spatt, J.) (denying defendants' motion for summary judgment because plaintiffs had repeatedly complained to company officer about harassment and he had failed to act, and office was so small that supervisors must have

16

overheard many of the incidents). The Plaintiffs have introduced overwhelming evidence to support this set of facts. Gomez witnessed numerous instances of harassment in the normal course of his job responsibilities, and conceded that he received Gabrielle D'Annunzio's complaint about Bautista. Ayken also did nothing to prevent the danger of Orellano, who eventually attacked one of the Plaintiffs *in Ayken's own basement*, and was subsequently convicted and deported. These events are sufficient, combined with the plethora of other disturbing allegations in this case, to affirmatively impute liability to Ayken on Plaintiff's Title VII claim. *See Coken Co., Inc.*, 2004 WL 2066886, at *1-3 (granting unopposed summary judgment on hostile work environment claim to plaintiff who was subject to sexually suggestive comments, offensive remarks, and unwanted touching and advances).

Finally, the Defendants may not avail themselves of the *Faragher-Ellerth* defense. Dkts. 30 at 17; 37 at 13. This defense consists of two elements: "(1) the employer exercised reasonable care to prevent and correct promptly any discriminatory harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Gorzynski*, 596 F.3d at 103 (internal quotations and alterations omitted). Here, Plaintiffs have introduced evidence that they each complained to Gomez on multiple occasions, and that the alleged harassment did not stop— indeed, Plaintiffs introduce specific facts showing that Gomez laughed along with the purported harassment. Further, Plaintiffs introduced evidence that Ayken failed to adequately disseminate and translate its employee handbook. This demonstrates that Ayken did not take sufficient or reasonable actions to prevent discriminatory behavior. *See Pugni v. Readers Digest Ass'n, Inc.*, 05-CV-8026, 2007 WL 1087183, at *17-18 (S.D.N.Y. Apr. 9, 2007) (McMahon, J.) (denying *Farragher-Ellerth* defense to defendant because manager failed to report plaintiff's complaints

of sexual harassment, and employer failed to provide adequate training for its anti-harassment policy). Furthermore, Plaintiffs' evidence shows that instead of taking action to correct any discriminatory harassing behavior, Defendants did the opposite—Gomez, the General Manager of the restaurant, laughed along with the harassers and contributed to the harassment. On these overwhelming facts, the *Faragher-Ellerth* defense is not available to Defendants.

In conclusion, Plaintiffs' Motion for Summary Judgment on the Title VII claim is granted. Defendants' Motion for Summary Judgment on the Title VII claim is denied.

## II.    New York State Human Rights Law

Claims brought under the New York State Human Rights Law are analytically identical to claims brought under Title VII. *See Patane v. Clark,* 508 F.3d 106, 113 (2d Cir. 2007); *Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997); *Dawson v. Cnty. of Westchester*, 351 F. Supp. 2d 176, 198 (S.D.N.Y. 2004) (Conner, J.) ("New York law essentially mirrors Title VII."). Thus, for the reasons set forth above, Plaintiff's motion for summary judgment on the NYSHRL claim is granted as to Ayken.

New York permits the imposition of liability on individual employees, unlike Title VII. Plaintiffs have also brought individual claims under the NYSHRL against Hassan and Gomez, and both parties move for summary judgment on these claims. *See* Dkts. 30 at 24–25; 43 at 44. The relevant provision of the NYSHRL states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6); *see* Dkt. 2 at ¶¶ 66–68 ("Defendants Ayhan Hassan and Dario Gomez aided and abetted Defendant Ayken[.]"). An individual does not have to take part in the primary violation himself to violate the terms of § 296(6). *See Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) (Sharpe, J.)

("[T]his court concludes that [defendants'] alleged conduct in ignoring, writing off, discouraging, and failing to investigate [plaintiff's] complaints could amount to acquiescence in and aiding and abetting of the creation of a hostile work environment."); *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 381 (S.D.N.Y. 1999) (Leisure, J.) ("This Court respectfully declines to adopt the Report's conclusion that allegations of failure or refusal to investigate a complaint of sexual harassment cannot, as a matter of law, satisfy the requirements of HRL § 296(6).").

Accordingly, Plaintiffs' evidence that Gomez joked with employees and laughed along with them when the employees were harassing Plaintiffs is sufficient to grant summary judgment for Plaintiffs. *See Romero v. Howard Johnson Plaza Hotel*, 97-CV-3706, 1999 WL 777915, at *9 (S.D.N.Y. Sept. 29, 1999) (Pauley, J.) (offering to "save the room" for alleged attacker, laughing at vulgar antics, and failing to intervene made it possible for a reasonable jury to conclude that defendant participated in the harassment "by adding fuel to the fire").

The application of this provision to Defendant Hassan is more difficult. Plaintiffs allege that Hassan was responsible for Ayken's sexual harassment policies and their failure to be distributed from 2002–2009, that Hassan failed to translate handbooks into Spanish, and that he failed to perform adequate background checks on employees. Dkt. 30 at 24. However, Plaintiffs fail to allege or provide any evidence that Hassan was actually aware of any harassment or complaints, and existing caselaw does not support NYSHRL liability absent this knowledge. *See Morgan v. NYS Atty. Gen.'s Office*, 11-CV-9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013) (Castel, J.) (granting motion to dismiss where Plaintiff failed to plead facts tending to show supervisor was aware of allegations of discrimination or otherwise participated in discriminatory conduct); *Urquhart v. Metro. Transp. Auth.*, 975 F. Supp. 2d 320, 344 (S.D.N.Y.

2013) (Batts, J.) (granting summary judgment on aiding and abetting claim because there was no evidence that individual defendant knew about hostile statement or discriminations); *cf. Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (reversing dismissal of claim because Defendants "not only took no action to remedy such behavior although they were aware of it, but also terminated [plaintiff's] employment on the basis of impermissible factors").

Thus, summary judgment is granted for Plaintiffs as to Ayken and Gomez; but granted for Defendants as to Hassan.

### III.    Plaintiffs' State Law Claims

Defendants move for summary judgment on Plaintiffs' state claims for negligent infliction of emotional distress, negligent supervision, and respondeat superior. Defendants argue that these claims are barred by the exclusive provisions of New York State Workers' Compensation Law. Dkt. 43 at 46–47.

The Second Circuit has held that common law negligence claims are barred by the New York's Workers' Compensation Law, which provides: "The right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee ... when such employee is injured or killed by the negligence or wrong of another in the same employ." *Torres*, 116 F.3d at 640; *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 138 (2d Cir. 2001) (applying *Torres* to negligent retention and supervision claims); N.Y. Work. Comp. Law § 29(6). There are limited exceptions to this rule, e.g., when the employer committed an intentional tort or another person committed an intentional wrong at the employers direction, *see Torres*, 116 F.3d at 640, but those exceptions do not apply here. Accordingly, Plaintiff's claims for negligent infliction of emotional distress, negligent supervision, and respondeat superior are dismissed. *See Davis v. Columbia Univ.*, 09-CV-9581, 2010 WL 2143665, at *5 (S.D.N.Y. May 26, 2010) (Baer, J.)

(dismissing claim for negligent infliction of emotional distress); *Liparulo v. Onondaga Cent. Sch. Dist.*, 5:06-CV-1068, 2009 WL 3790187, at *2–3 (N.D.N.Y. Nov. 12, 2009) (Suddaby, J.) (same); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 491 (S.D.N.Y. 1999) (Carter, J.) (dismissing negligent training, supervising, and disciplining claim); *Mondello v. Dun & Bradstreet Corp.*, 94-CV-4383, 1995 WL 495474, at *3 (S.D.N.Y. Aug. 18, 1995) (Sweet, J.) (citing New York Workers' Compensation Law to bar *respondeat superior* claim).[3]

## CONCLUSION

Summary judgment is GRANTED for Plaintiffs on their Title VII claim and on their New York Executive Law § 290 *et seq.* ("NYSHRL") claim against Ayken and Gomez. The parties are directed to submit damages briefing to United States Magistrate Judge William D. Wall pursuant to a briefing schedule set by that Court.

Defendants' motion for summary judgment as to the Title VII and the NYSHRL claims is DENIED, except as to the NYSHRL claim against Hassan, which is GRANTED. Defendants' Motion for Summary Judgment as to Plaintiff's state law claims for negligent infliction of emotional distress, negligent supervision, and respondeat superior is GRANTED.

---

[3] Plaintiffs cite *Linder v. City of New York*, 263 F. Supp. 2d 585, 591 (E.D.N.Y. 2003) (Glasser, J.) and *Chen v. Street Beat Sportswear, Inc.*, 226 F. Supp. 2d 355, 359–360 (E.D.N.Y. 2002) (Glasser, J.), but those cases do not appear to fall within controlling Second Circuit precedent and are not factually applicable here. *See Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 666 (S.D.N.Y. 2007) (Conner, J.) ("The *Linder* court's citation to—and contravention of— binding precedent is, to say the least, puzzling, and we are not of the view that a district court may disregard controlling Second Circuit precedent absent exceptional circumstances not present here.").

**SO ORDERED**

Dated:      June _10_, 2014
              Brooklyn, New York

                                    HON. WILLIAM F. KUNTZ II
                                    United States District Judge